## DINSMORE, *v.* THE LOUISVILLE, NEW ALBANY & CHICAGO RAILROAD CO.*

*(Circuit Court, D. Indiana.* ———, 1880.)

1. COMMON CARRIERS — EXPRESS COMPANIES — SHIPPER — INJUNCTION. The refusal of a railroad company to carry an express company's safes and chests, unless it was allowed to open the same and inspect their contents, or was furnished with an inventory of such contents, with the further understanding that the railroad company might, whenever it saw fit, open and inspect the safes and chests of the express company, and also collect the freight on each separate article or parcel contained therein, as if each had been shipped by itself, violates both the express company's rights as a shipper, and the terms of an interlocutory judgment temporarily restraining an interference with the express company's business.

    10 M. & W. 397.

2. SAME—OFFICERS AND EMPLOYES—INJUNCTION—CONTEMPT—ADVICE OF COUNSEL.—The officers and employes of such railroad are not liable for contempt in thus violating such injunction, where they have acted under the advice of able and reputable counsel, and where it was chiefly desired to obtain a construction of the injunction order.

In Chancery. Rule to show cause why certain parties should not be attached for contempt of an interlocutory order of injunction.

*Clarence A. Seward* and *Baker, Hord & Hendricks,* for complainant.

*Bennet H. Young,* for respondent.

GRESHAM, D. J. The bill of complaint in this case gives a comprehensive history of the origin and development of the express business in the United States, and of the relations which, for some 40 years, have subsisted between express carriers and railway companies generally, and it states particularly the relations that have existed between the Adams Express Company and the defendant.

It appears that, since August, 1862, until the bringing of this suit, the Adams Express Company has conducted its business as an express carrier over the line of this railroad from Greencastle, Indiana, south to New Albany and Louis-

*See *Dinsmore* v. *Louisville, C. & L. Ry. Co.* 2 FED. REP. 465.

ville, with the exception of an interval of two years, during which the Adams Express Company withdrew from this line. The agreement between the Adams Express Company and the Louisville, New Albany & Chicago Railroad Company, the predecessor of the defendant, and which, as stated in the supplemental bill, was subsequently recognized and adopted by the defendant, under which the Adams Express Company was carried by the defendant and its predecessor during this period, was, from time to time, modified as to rates of charges but the general plan or mode of conducting the business remained the same. According to that plan or mode, as, appears by affidavits read at the hearing, the express company was accorded a certain space in the baggage car of the defendant's passenger trains for its express matter and messengers, for which it paid an agreed sum in gross where the express freight did not exceed a specified weight, and an additional charge per hundred pounds where the express matter exceeded that specified weight. The express company, by means of its stationed employes, and its horses and wagons, and other conveniences and appliances connected with its offices, collected the express parcels to be transported by it from all persons desiring to ship property through its instrumentality, and delivered them aboard the defendant's baggage car, where they were taken into personal charge by a messenger of the express company, and retained by him in his personal charge, during their transit by rail, until their arrival at the place of destination, when they were delivered to the proper agent of the express company at that point for distribution and delivery to the respective consignees. Parcels containing money or other articles of great value were packed and carried in iron safes. Parcels containing ordinary merchandise of less value were usually packed and carried in chests and trunks, while articles of greater weight or bulk, or articles of comparatively small value, that did not require so great care, were not thus packed, but deposited upon the floor of that part of the car assigned to the express messenger.

During the same period another express company, the American, was carrying on a like business, in a similar man-

ner, and upon similar terms, over that portion of the defendant's railroad from Greencastle to Michigan City, the northern terminus of the road, thence to Chicago. The bill avers that these two express companies, during the period named, interchanged express matter at Greencastle, and that thereby each of them had a continuous and direct line of express communication, daily, between Louisville and Chicago, and Chicago and Louisville.

The affidavits show that each of these express companies made concessions in favor of such through express matter from its own local rates, so as to produce a reasonable through rate, and such as either company might have charged if it had performed the entire carriage itself. The affidavits also show that since the first day of July, 1880, when the defendant's course of business with the Adams Express Company complained of commenced, the two express companies, by arrangement between them, have continuously received express matter at any point on the line of one company, destined for any point on the line of the other company, as through matter, becoming responsible for its delivery to the consignee, and billing it through at through rates.

The bill alleges that in the year 1879 certain persons, officially or otherwise connected with the Louisville & Nashville Railroad, of Kentucky, perfected the organization of an express company, under a Kentucky charter, known as the Union Express Company; that through their influence the Louisville & Nashville Railroad Company, and several other southern railroad companies controlled by it or under its influence, by concert between them, determined to give to the Union Express Company the exclusive right to do business as an express carrier over their lines, and to exclude the Adams Express Company, its messengers and agents, therefrom; that they also procured the Louisville & Nashville Railroad Company, which, by ownership of stock or otherwise, exerted a controlling influence over the defendant, to cause the defendant to notify the Adams Express Company that all existing agreements, express or implied, respecting the transportation of express matter by the defendant over its road, for the

Adams Express Company, would be considered null and void on and after April 20, 1880. The bill charges that the defendant had entered into a contract with the Union Express Company, whereby the latter company was to be granted the exclusive privilege of doing an express business over the defendant's road, and that it was the purpose of the defendant, on and after the day last named, to exclude the Adams Express Company, its messengers, and agents from its line. The bill prayed, among other things, that the defendant might be enjoined from carrying this purpose into execution, and from making any discrimination, as to facilities or charges, in favor of any other express carrier or person, against the Adams Express Company, and, pending final hearing, for an interlocutory restraining order. The original bill was filed on the fifteenth day of April, 1880.

On the nineteenth day of July, 1880, the complainant filed an amendment and also a supplement to the bill. The amendment shows more particularly the agreement between the Adams Express Company and the railway company that was in existence when the latter gave notice to the express company that all existing arrangements between them should terminate on the twentieth day of April, as above stated. This agreement, which was in writing, though formal execution of it by the parties was neglected or omitted, was entered into on the eleventh day of May, 1870, and has ever since, until the time of the giving of the notice above mentioned, been regarded and acted upon by the parties as the contract subsisting between them.

By this agreement the railroad company contracted to furnish the express company sufficient space, in its baggage cars attached to its passenger trains, for the transaction by the express company of its business, and to grant to the express company the privilege of carrying a messenger, with a safe and 2,000 pounds of freight, each way, daily, between New Albany and Greencastle, for which service the express company agreed to pay the railroad company $33 per day; and for all freight carried over the whole length of road between the above points, in excess of 2,000 pounds each way, daily,

the express company was to pay the further sum of 84 cents for each 100 pounds. Settlement was to be made monthly. It was agreed that the railroad company was not to allow its conductors or baggage-masters to carry express matter on passenger trains upon which the express company sent its messengers; that the railroad company should not, during the existence of the agreement, accord greater facilities or more favorable rates to any other express carrier; that the express company should assume all risk of loss or damage of property carried under the agreement, except such as might result from the carelessness of the railroad company, its agents, or employes; that the railroad company should carry such officers of the express company as might be necessary to the supervision of the express business free of charge; that money belonging to the railroad company should be carried for it by the express company over the line of railroad free of charge, but at the risk of the railroad company; and that from and to points off the line of railroad the express company should carry money for the railroad company at two-thirds of its regular rates to the public, and under the same responsibility as carrier as though full rates had been charged.

The agreement was to take effect on the fifteenth day of May, 1870, and continue in force one year, at the expiration of which period it might be terminated by either party, upon thirty days' previous notice in writing.

The supplement to the bill alleges that after the filing of the original bill, viz., on the —— day of May, 1880, the defendant and the Union Express Company abandoned the arrangement they had entered into, and the defendant determined to do its own express business over its own road, and that on the fifteenth of that month it did commence to do such business; that it entered into a joint or partnership arrangement with the Louisville & Nashville Railroad Company, and the Louisville, Cincinnati & Lexington Railway Company, for the transaction of an express business over their lines, organizing a joint and principal office at Louisville, under the exclusive management of the Louisville & Nash-

ville Railroad Company; that such combined express organization occupies upon the defendant's line the same independent position thereon as the Union Express Company was intended to occupy, and is as much an independent organization as that company would have been, and is no more entitled to exclusive rights than it would have been; that the defendant, finding that it could not, by its direct arbitrary act, exclude the Adams Express Company from its line, determined to accomplish the same result indirectly, by the imposition of oppressive terms and conditions that should be in effect prohibitory; that accordingly Mr. Veech, the president of the railway company, on the twenty-sixth day of June, 1880, addressed a letter to Mr. Gaither, the resident manager of the Adams Express Company, enclosing him a schedule of the defendant's local express charges between Louisville and Greencastle, as the charges that would be exacted of the Adams Company, and which would be put into effect on the first day of July, 1880; also advising that, in addition to such charges, the messengers and other employes of the Adams Company passing over the line would be required to pay full passenger fares; also that at Louisville and Greencastle, the terminal stations of the road, the messengers of the defendant's express would be required to take an account of all the freight and packages of the Adams Company, including money and valuables contained in its safes, before the same would be received for shipment, and that at intermediate points the freight should be received and an account taken of it on the train, and that the defendant proposed to allow the Adams Company, for gathering and delivering freight at stations along the line, a rebate of 10 per centum on the regular tariff rates; that on the thirtieth day of June, 1880, Mr. Gaither replied to this letter, saying that the terms proposed could not be accepted by the Adams Express Company; that the rates set forth in the schedule of rates so sent to Mr. Gaither, and which are copied in the supplemental bill, are the same rates prescribed by the defendant to be charged to its own express customers generally, including all services and expenses incident to the collection and personal delivery of parcels; that

the experience of the Adams Express Company, and of other large and long-established express companies, shows that the costs of such occasional services amount to about 50 per centum of the entire gross receipts; that on the first day of July, 1880, the agent of the Adams Company at Louisville delivered aboard the defendant's baggage-car, attached to its passenger train, the safe and chest of the express company, containing divers packed parcels of express matter, destined for various points south of Greencastle, and also for various points north of that place, to be transported in the usual course, but that the defendant's general superintendent of express demanded of the agent that the safe and chest should be opened for his inspection, which demand being refused by the agent of the Adams Company, the safe and chest were removed from the car and train by the defendant's superintendent of express, and the train departed without them; that on the next day the safe and chest were again tendered for transportation, with the same result, the defendant wholly refusing to receive the same or to permit them to be placed in the car unless they should first be opened for an inspection of their contents, and to enable the defendant's express agent to make a list or schedule of the contents; that this occurred at defendant's terminal station in Louisville; that the Adams Express Company's agent then took the safe and chest across the river to the Indiana side, and there, and at the defendant's depot in New Albany, tendered the same successively to Cowk, the conductor, Board, the agent, and Harry Rose, the local express agent, at New Albany, of the defendant, in each case with like result, each refusing to receive the safe and chest, and to prevent them to be placed aboard the train, unless they should first be opened for inspection, so that a list of the contents might be taken; that afterwards, on the same day, July 2d, the proper managing officer and agent of the Adams Company conferred with the president of the railway company, with the view of effecting some reasonable agreement, by which the business might be carried on, at least, during the pendency of the suit, and until the rights of the parties might be ascertained by decree; but that defend-

ant, through its president, still insisted upon all the terms and conditions prescribed by his letter of June 26th, and would make no concession whatever, except that instead of a personal examination of the contents of safes and chests, by his express officers or agents, the Adams Express agents might present a written statement of the contents of the safes and chests, to the end that freight might be charged at the defendant's local scheduled rates upon each parcel, instead of upon the aggregate weight of the safes and chests with the packed parcels therein; that to prevent the breaking up of the business of the Adams Express Company, upon that line, which would necessarily result from any material interruption of its business, it was compelled, for the time being, to submit to the terms exacted by the defendant; that the terms imposed by the defendant are so onerous and oppressive as to render it impossible for the Adams Company to continue permanently to do business over the line, in compliance with them. The bill charges that it is the settled purpose of the defendant, either by its direct arbitrary act, or indirectly by the imposition of such unequal and oppressive terms as will, in effect, be prohibitory, to break up the business of the Adams Express Company and to exclude that company from its line of road. In addition to the relief prayed by the original bill, the supplemental bill, among other things, prays that the defendant may be required to transport the express matter of the Adams Company at reasonable rates of freight; that it may be required to make a reasonable rebate or reduction from its general rates, on account of the accessorial service performed for itself by the Adams Company, and that it may be enjoined from demanding an examination of the contents of the safes and chests of the Adams Company, or from demanding a statement of said contents.

The bill, and the amendment and supplement, were each verified by affidavit. Upon the filing of the original bill a temporary restraining order was granted by me, and it was ordered that the defendant show cause, on the seventeenth day of May, 1880, why a provisional or preliminary injunction should not issue according to the prayer of the bill. On the day last

named, and the matter having been heard by Mr. Justice Harlan, an interlocutory injunction was granted by him in the following terms:

"Come now the parties, by their solicitors and attorneys, and, as heretofore ordered, the defendant is required to show cause why a provisional and preliminary injunction shall not be made and issue herein, according to the prayer of the bill of complaint in that behalf; and the court having heard the argument of the solicitors and counsel of the parties, and being sufficiently advised, does order, adjudge, and decree that, until the further order of the court on the final hearing of this cause, the defendant, its agents, officers, servants, and employes be, and they hereby are, severally, restrained from interfering with or disturbing in any manner the enjoyment by the Adams Express Company of the facilities now accorded to it by the defendant upon its lines of railway, for the transaction of the business of the said Adams Express Company, and of the express business by the public confided to it; that the defendant shall receive for transportation the express matter and messengers of the Adams Express Company at all its depots and stations, and transport the same to destination, without molestation or hindrance, upon the same terms as to compensation for freight or passage money, and by the same train that it receives and transports express matter and messengers for any other express company, or for any other part or portion of the public; and it is adjudged and decreed that the said defendant has no lawful right to make any contract of any kind with any person, firm, or corporation, whereby it shall grant any rights, privileges, accommodations, or facilities over its lines of railway which will prevent the said defendant from granting the same or equal rights, privileges, accommodations, and facilities to the Adams Express Company, or to any other portion of the public desiring to have, occupy, enjoy, and possess the same, and upon the same and equal terms as are offered by or afforded to any other person, firm, or corporation. And the defendant is forbidden to interfere with any of the express matter or messengers of the Adams Express Company, and from exclud-

ing or ejecting any of its express matter or messengers from the depots, cars, and lines of said defendant, and from refusing to receive and transport over its lines of railway, express matter and messengers of the said Adams Express Company; and from interfering with or disturbing the business of the said Adams Express Company, or its present relations in reference thereto with the said defendant, or preventing the transaction of its business over the lines of the defendant on the same terms and conditions as are or may be permitted to any other express company or individual for similar business; nor to charge for the same in excess of what is reasonable compensation, with liberty to the parties to make such further application herein to the court as they may be advised is necessary to fix what is and shall be a reasonable compensation, or for any other matter growing out of the case. In the event of a dispute between the parties, pending the preparation of this cause, as to what is reasonable compensation for the services performed by the defendant company for complainant, such difference shall be referred to the court, after due notice, and, pending such reference, the complainant shall not be disturbed by the defendant company in the transaction of express busines over its lines upon reasonable terms as to compensation and otherwise. This order shall not conclude either party upon the final hearing as to any question upon the merits, which may be disclosed by the pleadings or the testimony, its object being only to preserve the present *status* of the parties until the case is prepared for decree."

On the fifteenth of July the complainant filed the affidavits of L. C. Weir, and upon it moved for an order against the defendant, and also Valentine W. Rose, its superintendent of express, A. C. Cowk, one of its passenger train conductors, Oscar Board, its agent at New Albany, and Henry Rose, its local express agent at the city of New Albany, to show cause why they should not be attached for contempt of the foregoing injunction order.

The affidavit set forth, among other things, the particulars of the tender of the safe and package chest of the Adams Express Company to Valentine Rose, the defendant's super-

intendent of express, on the first and second days of July, 1880, and his refusal to receive the same for transportation unless the agent of the Adams Company tendering them would open them for examination by said Rose, to the end that he might make a schedule of their contents. Also of the tender by the Adams Company's agent of the safe and chest, on the second day of July, to A. C. Cowk, conductor, Oscar Board, agent at New Albany, and Harry Rose, local express agent at New Albany, and the refusal by each of them to receive the same, unless they should first be opened for inspection for the purposes mentioned. As to these transactions of the first and second of July the affidavit accords with the allegations of the supplemental bill.

The affidavit also set forth the facts alleged in the original bill as to the arrangement between the Adams and American Express Companies for the interchange of through express matter to Greencastle, upon such terms that such through express matter was carried by the two companies at one reasonable through rate; but it stated that since the first day of July, 1880, the defendant, while carrying such through express matter by its own express at a reduced through rate, has exacted of each of these two express companies, respectively, local rates of freight between the place of shipment of express matter and Greencastle, and the same local rates upon all such matter between Greencastle and the place of destination, so that the aggregate charges between the two companies for such through carriage greatly exceed the rate at which defendant performed such carriage for shippers by its own express, and materially exceed the aggregate compensation received by these two companies for the service; the effect being that each express company is required to pay to the defendant, for the railroad freight between Greencastle and the place of shipment and delivery, as the case may be, materially more than it receives from its employer for the same service, and also for all its accessorial service.

A rule was granted against the parties named to show cause why they should not be attached for contempt of the interlocutory order of injunction. Upon the return day of

the rule each party filed a second answer. These answers do not deny the statements of the affidavit of Mr. Weir touching the above-mentioned transactions of July 1st and 2d, nor as to the defendant's mode of charging the Adams and American Express Companies local freight rates on such express matter carried past Greencastle from and to points south, and to and from points north, of that place. On the contrary, these matters may be said to be admitted.

Numerous affidavits were read upon both sides, but as to the material matters of facts contained in them there is no very important conflict.

It was admitted by each party cited, except A. C. Cowk, that he had knowledge of the injunction order on and prior to the transaction mentioned in the affidavit of L. C. Weir.

After the railroad company had refused to receive on board its cars the express company's safes and chests, on the first and second days of July, the former's president modified his demand as to the terms upon which the express company would be allowed to continue its business over the defendant's road, to the extent that, instead of a personal examination of the contents of the safes and chests, the express company might furnish a written list or inventory of them, and pay the defendant freight at its local schedule rates upon each parcel, instead of upon the aggregate weight of the safes and chests, and the packed parcels therein; the defendant reserving, however, the right to open the safes and chests, and inspect their contents, whenever it saw fit to do so. It is insisted that Mr. Gaither, the express company's manager, agreed to or acquiesced in the terms embraced in this modified demand, but the proof shows the contrary. Instead of consenting and acquiescing, as claimed by counsel for the defendant, Mr. Gaither submitted to the terms exacted, fearing that only a temporary interruption of his company's business would be fatal, so far as this line of road was concerned. It is urged that the terms imposed upon the express company as conditions upon which it might continue its express business over this line of road are reasonable and lawful, and not in violation of the order of the court.

As between the parties, the express company was a shipper and the railroad company was a carrier. Unless the carrier has reason to suspect, from the condition of the package offered, or from some other circumstance, that the contents are of a dangerous character, he is bound to receive and transport it to the consignee. This rule, however, is limited to carriers who, by their general business, are engaged in the transportation of articles which are not in themselves dangerous to life and property. If goods properly packed are offered for shipment, the carrier cannot refuse to receive them, unless he be first permitted to open the package and inspect the contents. In the *Nitro-Glycerine Case*, 15 Wall. 524, Wells, Fargo & Co. received at New York a box containing nitro-glycerine, to be carried to San Francisco by the isthmus of Panama. There was nothing in the appearance of the box indicating the character of its contents, and it was received without information as to its contents being asked or given. On its arrival at San Francisco the box was taken to the premises occupied by the carrier as a place of business. It was leaking, and while the servants of the carrier were attempting to open it the nttro-glycerine exploded, killing a number of persons, and injuring the premises occupied by the carrier, and the adjacent premises. The carrier had no knowledge or reason to suspect the dangerous character of the contents. Suit was brought against the carrier for the damage caused by the accident to the premises occupied by other parties. In deciding the case, *Field*, J., said: "If express carriers are thus chargeable with notice of the contents of packages carried by them, they must have the right to refuse to receive packages offered for carriage without a knowledge of their contents. It would, in that case, be unreasonable to require them to accept as conclusive, in every instance, the information given by the owner. They must be at liberty, whenever in doubt, to require for their satisfaction an inspection even of the contents, as a condition of carrying the packages. This doctrine would be attended, in practice, with great inconvenience, and would seldom lead to any good. Fortunately, the law is not so unreasonable. It does not

exact any such knowledge on the part of the carrier, nor permit him, in cases free from suspicion, to require information as to the contents of the packages offered." The charges for carriage should be in proportion to the responsibility that the carrier is required to assume, and he may, therefore, inquire of the shipper the value of the package offered, and, if the latter declines to give the information asked for, the carrier can fix the value to suit himself, and thus limit his risk. If the shipper of diamonds or other articles of value, in answer to an inquiry of the carrier, fixes an inadequate value upon them, and they are afterwards lost, the liability of the carrier cannot exceed the valuation thus made. Persons who wish to ship articles of great value, such as money or jewels, and hold the carrier accountable for the loss of them, must not purposely keep him in ignorance of the value of the articles entrusted to his care.

In 10 M. & W. 397, a number of small parcels belonging to different owners were united in one large package, and directed to one person as consignee, and it was held that the carrier was bound to take the package, charging for it as if each parcel belonged to one person, and that there was no right to charge upon each separate parcel, as if it had been shipped by itself.

The defendant's refusal to carry the express company's safes and chests unless it was allowed to open the same and inspect their contents, or unless it was furnished by the express company with an inventory of the contents, with the understanding that whenever the defendant saw fit it might open the safes and chests and inspect their contents, and also unless it was permitted to collect the freights on each separate article or parcel as if it had been shipped by itself, was all in violation of the express company's rights as a shipper, and in violation of the injunction order.

It is asserted by the express company, and not denied by the defendant, that at the time the original bill was filed it was the intention of the latter company to exclude from its road all other express companies, and to allow the Union Express Company the exclusive privilege of doing express busi-

ness over its line.    From the facts now before the court it looks very much like, after abandoning the arrangement between the defendant and the Union Express Company, the former sought to do by indirection what it feared it would not be allowed to do directly.    The new terms and conditions upon which the Adams Express Company was to be allowed to continue its business over the defendant's line of road were doubtless intended to be prohibitory, and the proof shows that practically they were.

But it is now urged by the defendant's counsel that it may lawfully do its own express business over its own line of road, and that at the rates at which it is now carrying freight for the Adams Express Company it can do its own express business with profits to its stockholders.    On the other hand, it is insisted by the express company's counsel, that, by its charter, the defendant is not authorized to do an express business.

Monopolies are not favored by the law, and it would seem that if railroad companies can afford to do the express business over their own lines as well and satisfactorily in all respects as that business is or can be done by express companies, and at the same time with less expense to the public, express companies should not be heard to complain.

The proper time, however, to decide this question, which is now the chief controversy between the parties, will be at the final hearing.    I now express no opinion on it.    The terms and conditions upon which the defendant has received and transported the express company's freight for a number of years before this suit was commenced have been fully stated, and from a careful reading of the injunction order, though it is somewhat ambiguous, it sufficiently appears that, without change in the terms and conditions, and until the final hearing, the express company was not to be disturbed in carrying on its business over the defendant's line of road; and if, in the meantime, either party should think the compensation which the defendant was thereby authorized to demand and receive from the express company for the privileges enjoyed by the latter were unreasonable, application could be made to

the court to determine what would be right between the parties; that is to say, that, until the final hearing, or the further order of the court, the express company should be allowed to continue its business over the defendant's road on the same terms as to compensation and otherwise as it was before the suit was commenced.

The relations which have subsisted between the two companies before the litigation commenced were to continue until it was ended, and all controversies which might arise out of these relations were to be decided, not by the defendant, but by the court.

The injunction has been violated, but the parties against whom the order to show cause was entered have all answered that in doing what they did they had no thought of disregarding the order of the court, and that they acted upon the advice of counsel, supposing that they were doing nothing that they were forbidden to do by the injunction.

The counsel who thus advised these parties are in good repute, both for ability and integrity. That they believed they were right in the construction which they placed upon the order of the court, and in the advice which they gave to the defendant, its officers and employes, I have no doubt. What seemed to be the chief desire of counsel on both sides, in the argument, namely, a construction of the injunction order, has been accomplished, and the rule to show cause will be discharged on payment of costs, with leave to the complainant to move for an attachment in the event that the foregoing views of the court be disregarded by the defendant.