## UNITED STATES v. TAYSTEE BAKING CO.

### No. 1027.

District Court, N. D. Texas, Dallas Division.

June 1, 1944.

---

A. W. Christian, Asst. U. S. Atty., of Dallas, Tex., for the United States.

Webster Atwell, of Dallas, Tex., for defendant.

DAVIDSON, District Judge.

This is a suit for an injunction on the part of the Food Administration against the defendant baking company. It is not questioned that the injunction may issue if the facts in evidence warrant and justify it.

The serious question presented is just how far in a proceeding of this character the management of a corporation, as an employer, may be bound by the acts of its salesman when acting without authority and whose actions have not been ratified.

The law under which the relief is invoked comes from the Second War Powers Act as set forth in 50 U.S.C.A.Appendix § 633:

"The district courts of the United States * * * shall have jurisdiction of violations of this subsection (a) or any rule, regulation, or order or subpoena thereunder, whether heretofore or hereafter issued, and of all civil actions under this subsection (a) to enforce any liability or duty created by, or to enjoin any violation of, this subsection (a) or any rule, regulation, order or subpoena thereunder, whether heretofore or hereafter issued."

The initial controversy grows out of that provision, or regulation, forbidding bakers or dispensers of bread from taking up, or repossessing, bread when once it has been delivered. The defendant Taystee Baking Company is a large breadmaking establishment; its output runs into millions; its employees, including managers, salesmen and clerks, reach into many hundreds.

The evidence shows that a number of investigators, or special officers, of the Food Administration, have seen the drivers return from stores where they have delivered bread, with bread in their arms and place it in the front of the hack, or automobile. There is little evidence, however, that this bread was ever taken up with the knowledge of the company, or that the company ever gave the salesman or merchant any credit for its repossession.

The practice of the bakery was to load the delivery vehicles with bread and start them out upon a circuit making deliveries to their customers. Formerly, before the institution of this regulation, a practice prevailed between the merchant and the baker by which, if bread had not been sold by the merchant, the baker would repossess it and deliver fresh bread in its place. Some of the merchants still insist on this practice to save themselves the loss of having spoiled or stale bread on hand. In some instances the repossessed bread is delivered by the salesman to another purchaser who desires seasoned bread, or bread that is more than a day

old, from which he can more easily make toast. It is in the evidence that the bread remains good for three or more days, depending upon the weather.

When a salesman returns in the evening, if he has failed to deliver all the bread that he carried out, the portion that has not been delivered is returned to the baker. If he has repossessed any bread that is still in good condition, according to the evidence it is practically impossible to tell the difference between the bread repossessed and the bread sent out on the particular morning.

The government's evidence shows, as set forth in the bill of particulars, that a number of these salesmen did repossess bread, usually in small quantities, but in a number of instances. Some of the salesmen claimed to have taken the bread home for their own use, or perhaps to have made other sales of it. Only one admits having returned it to the bakery, and the bakery disclaims any knowledge of such.

The defendant, on its side of the controversy, sets forth that when this order was first promulgated that their vice president and manager, Mr. Fox, who testified in this case, went to Chicago and there entered into a lengthy conference, in the nature of a school of instruction, setting forth the manner in which this regulation of the Food Administrator might be more effectively carried out; that he brought the instructions home with him and passed them along to all of his managers in the several cities where they had plants; that he undertook to have each of his managers and salesmen instructed in the purpose and object of the law, and expressly forbade them taking up bread; that he has rigorously and conscientiously endeavored to adhere to the regulation to the point that he has many customers who no longer do business with his bakery.

As a further evidence of the efficiency of his effort he shows that prior to this regulation the bread repossessed sometimes amounted to as much as 8% of that sent out; that since the adoption of these regulations it has been in many cases only a fraction of 1%; that its plant at Houston did not make a good showing in this respect and that the company has changed managers because of such fact, managers and salesmen having been discharged for violating bread orders in the cities of Galveston, Houston, Fort Worth, Abilene, Wichita Falls, Dallas, and other points.

There was no evidence that the company, through its manager and directors, knew of or consented to the violations, nor is there evidence that they gave any salesman credit for any bread that he took up. The company admits that there were violations in the way of taking up bread by its salesmen, but that same were committed contrary to instructions of the defendant, without its knowledge and without its consent, and that the relative amount so repossessed by the salesmen themselves was infinitesimally small compared to the gross amount of sales.

The defendant also offered in evidence numerous letters of instruction to its salesmen and employees, as well as magazine advertisements, seeking to impress its employees with the necessity of observing the regulations.

There is not any violent conflict in the evidence. If the defendant company should be enjoined for the unauthorized act of its salesmen, then the evidence is sufficient. Does the law, in the light of the record thus made, when tested by the rules of equity, call for the issuance of an injunction?

"Whether such employer should be enjoined or not depends upon whether in good faith he was attempting to comply with the act and upon what he has done to effect compliance since he acquired knowledge of the improper conduct of his agents." Walling v. Woodruff, D.C., 49 F.Supp. 52, 56.

We consider the foregoing announcement as one embracing the elements of equity in such cases as the one now before us.

"The final test in every case will be the existence and manifestation of good faith by the defendant." Walling v. Builders' Veneer & Woodwork Co., D.C., 45 F.Supp. 808, 810.

The Hecht case, which went to the Supreme Court, Hecht Co. v. Bowles, 321 U.S. 321, 64 S.Ct. 587, was one under the Price Control Act, 50 U.S.C.A.Appendix § 901 et seq., which also authorized an injunction against its violators, but in much stronger language:

"Whenever in the judgment of the Administrator any person has engaged or is about to engage in any acts or practices which constitute or will constitute a violation of any provision of section 4 of this Act, he may make application to the ap-

propriate court for an order enjoining such acts or practices, or for an order enforcing compliance with such provision, and upon a showing by the Administrator that such person has engaged or is about to engage in any such acts or practices a permanent or temporary injunction, restraining order, or other order shall be granted without bond." Sec. 205 (a) Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix § 925(a).

The defendant Hecht was the operator of a large department store. Hundreds, even thousands of violations of ceiling prices occurred. The defendant company apparently did all in its power to prevent this, installing at its own expense some twenty-eight special inspectors, bookkeepers and agents for this purpose. It invited the officers of the Office of Price Administration to come into its premises and personally aid in formulating plans and regulations among its salesmen to put a stop to such violations. The trial judge found (Brown v. Hecht Co., D.C., 49 F.Supp. 528, 532,) that the company had acted in good faith in its efforts to observe the law. Judge Letts, in rendering his decision in the trial court, expressed his views in these words:

"Counsel for plaintiff think the quoted language makes it mandatory for a court to issue an injunction when any violation is shown. * * * A court of equity may not be divested of jurisdiction by implication. The general equity powers of a court remain unimpaired except where a statute is so rigid as to inhibit the application of equitable doctrines. * * * I conclude that a just result requires a dismissal of plaintiff's complaint."

The Court of Appeals, (App.D.C., 137 F.2d 689) did not agree with the opinion of Judge Lett of the trial court. A writ of certiorari was had to the Supreme Court (320 U.S. 727, 64 S.Ct. 81) and an opinion was rendered by Justice Douglas, who said (321 U.S. 321, 64 S.Ct. 587, 589):

"There is no doubt, however, of petitioner's good faith and diligence. The District Court found that the manager of the store had offered it as a laboratory in which the Administrator might experiment with any regulation which might be issued. Prior to the promulgation of the regulation the petitioner had created a new section known as the price control office. That office undertook to bring petitioner into compliance with the requirements of the regulation in advance of its effective date. The

head of that office together with seven assistants devoted full time to that endeavor. * * *

"Respondent insists that the mandatory character of § 205(a) is clear from its language, history and purpose. He argues that 'shall be granted' is not permissive, that since the same section provides that the Administrator 'may' apply for an injunction and that, if so, the injunction 'shall' be granted, 'may' and 'shall' are each used in the ordinary sense. * * *

"It seems apparent on the face of § 205 (a) that there is some room for the exercise of discretion on the part of the court. * * * the standards of the public interest not the requirements of private litigation measure the propriety and need for injunctive relief in these cases."

Though the statute be in favor of an injunction in much stronger language than that now before us, the Supreme Court holds in its opinion by Justice Douglas that the right to an injunction must still be controlled by the rules of equity that have come down to us through the years.

Another consideration that impels the court to act with caution and care is the fact that the plaintiff in the case is the government of the United States. Where two litigants are on equal footing and one of them sues out an attachment or writ of injunction and does it wrongfully, so that the defendant is injured, the plaintiff may be required to respond in damages to compensate the injury. But where the government appears, if it injures a defendant by suing out an injunction, there is no recourse in the way of damages, there can be no reconvention in the courts. The government stands behind its robe of sovereignty and may not be sued, as the individual may. Therefore, the greater caution, and the more careful should be the consideration. Fleming v. National Bank, D.C., 41 F.Supp. 833.

There is no doubt a feeling widely indulged among our people that our government desires nothing unfair against one of its citizens, and that when it comes into court that fact alone should carry great weight. However, the government can only act through its agents, and those agents are but human. When the government appears in courts of equity, the humblest citizen will weigh in the scales of justice as will the United States government itself. If the government through its agents can

do no wrong, then the action of its agencies should not be reviewed in courts of equity and justice, but should be obeyed without question. The fact that an arm of the government has become a party to a court trial is a matter for careful consideration by that court, but it is that same consideration which the court is due to the humblest of litigants. The rules of equity apply to all alike.

 Before granting an injunction in any case of this character, the court may well consider the matter of the enforcement of its decree. This enforcement must be by contempt. Now if the record made in support of the petition for an injunction would not support an application to have the defendant adjudged guilty of contempt, then we think the court should act with great caution.

Dealing with the subject of injunctions, we quote the words of a recognized authority:

"One against whom an injunction order has been issued is bound not only to abstain from violating it in person, but also to endeavor in good faith to prevent its violation by his agents, employees, or assignees. He cannot evade liability by permitting the act enjoined to be done by others in his presence and with his acquiescence. But one who in good faith has made an earnest effort to secure obedience to the injunction will not be held in contempt for disobedience by those in his employ." 32 C.J. 491, Sec. 852.

"The power to punish for contempt should be used sparingly, with caution, deliberation, and due regard to constitutional rights; it should be exercised only when necessary to prevent actual, direct obstruction of, or interference with, the administration of justice. Within these limitations, however, the matter of determining and dealing with contempts is within the court's sound discretion * * *." 17 C. J.S., Contempt, p. 68, § 57.

"The punishment of civil contempt is a remedial, preservative, or coercive, rather than a vindictive or punitive, act, and, as noted in § 57 supra, is inflicted with great caution." 17 C.J.S., Contempt, p. 133, § 91.

Another element of consideration for the court is, will the granting of an injunction materially affect or better the situation of which there is complaint? If the defendant company is placed under in-

junction, can it do more than it has already done? Can it be more diligent than the record shows it has been? The salesmen and managers know the company's instructions. They know the company has been firing those who disobey these instructions; moreover, they know that they, themselves, may be criminally punished for not adhering to the rules and orders of the Food Administration. The record discloses that the violations for the past several months have been very small compared to the volume and that the bread returned has been reduced from 8% to practically 1%, indicating that the bread is being actually consumed and that there is no waste.

An equitable rule which we think should govern this case might be stated in these words:

"An employer may not be held guilty of contempt for the act of his salesmen, whose act he has neither authorized, consented to, nor ratified."

It is the opinion of the court that the defendant has not wilfully or knowingly condoned any action of its agents in violating the food regulations, and, so finding, the injunction must be denied.