**BIGELOW et al. v. RKO RADIO PICTURES et al.**

No. 4525.

District Court, N. D. Illinois, E. D.

April 21, 1948.

Thomas C. McConnell, of Chicago, Ill., for petitioners.

Defrees, Fiske, O'Brien & Thomson, by Vincent O'Brien, all of Chicago, Ill., for Warner Bros. Pictures, Inc., and James C. Coston.

Dwight, Harris, Koegel & Caskey, by Otto E. Koegel, John F. Caskey, and Frederick W. R. Pride, all of New York City, for Twentieth Century-Fox Film Corporation, Spyros P. Skouras, John H. Lorentz, W. C. Gehring, and Joseph Neger.

Jacob I. Grossman, of Chicago, Ill., and Alfred B. Teton, of Washington, D. C., for Barney Balaban, John Balaban, Louis Phillips, and Walter Immerman.

Mayer, Meyer, Austrian & Platt, by Miles Seeley, all of Chicago, Ill., for Loew's, Incorporated, Nicholas Schenk, William F. Rodgers, J. E. Flynn, W. E. Banford, RKO Radio Pictures, Inc., and Sam Gorelick.

Poppenhusen, Johnston, Thompson & Raymond, by Edward R. Johnston and Samuel W. Block, all of Chicago, Ill., for Paramount Pictures, Inc., and Balaban & Katz Corporation.

IGOE, District Judge.

The litigation out of which this contempt proceeding grows has been previously reported. Bigelow v. RKO Radio Pictures, Inc. et al., 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652, and 7 Cir., 150 F.2d 877. Following the opinion of the Supreme Court, this court, on October 16, 1947, entered a decree subjecting the defendant distributors and exhibitors to certain restraints. On appeal, the decree was substantially affirmed and became effective on the 19th day of November, 1947. See Bigelow v. RKO Radio Pictures et al., 7 Cir., 162 F.2d 520, certiorari denied 68 S.Ct. 158. Approximately two months later, a petition for a rule to show cause was filed, charging RKO Radio Pictures, Inc., Loew's, Incorporated, Paramount Pictures, Inc., Twentieth Century-Fox Film Corporation, Balaban & Katz Corporation, Warner Bros. Pictures, Inc., and Warner Bros. Theatres, Inc., as well as several individuals, with being in contempt of this court because of their noncompliance with its decree. The respondents answered, alleging compliance.

I.

At the outset we are met with an inquiry as to whether these proceedings involve civil contempt, as contended by respondents, or both civil and criminal, as contended by the petitioners.

The petition for the rule to show cause bears the original equity case number, and

was filed by the plaintiffs in the equity case. No reference is made in the first fourteen paragraphs of the petition to the criminal or civil character of the contempt, but in the fifteenth paragraph the court was requested to issue a rule requiring the respondents to show cause why each of them should not be adjudged in civil and criminal contempt and punished in a manner provided by the law applicable thereto.

After the filing of the petition and the issuance of the rule to show cause, the respondents filed answers, which in some instances were quite detailed in their discussion of the facts. Thereafter the cause came to hearing before this court without a jury. During the presentation of the petitioners' case, several respondents were called as witnesses by the petitioners. In the course of the arguments on the motions to dismiss, at the close of petitioners' case, counsel for respondents referred to the proceedings as civil in nature, while counsel for the petitioners referred to them as criminal.

The distinction between civil and criminal contempt has been the subject of long and learned discussion. Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797, 34 L.R.A.,N.S., 874; Lamb v. Cramer, 285 U.S. 217, 52 S.Ct. 315, 76 L.Ed. 715. The courts, however, did not agree upon an exact formula to be used in determining the character of a contempt proceeding. See McCann v. New York Stock Exchange, 2 Cir., 1935, 80 F.2d 211. The adoption of Rule 42 of the Rules of Criminal Procedure, 18 U.S.C.A. following section 687, was intended to establish a simple test by which the character of such proceedings could be readily ascertained. Rule 42(b) in clear language provides that a criminal contempt not requiring summary disposition under Rule 42(a), shall be prosecuted on notice. The notice must state the essential facts constituting the criminal contempt and describe it as such. The notice must be given orally by the judge or on application of the United States Attorney or of an attorney appointed by the Court for that purpose. In such a proceeding, the defendant is entitled to a trial by jury, and to admission to bail. This summary of Rule 42(b) is enough to disclose that Rule 42(b) was not complied with in this case. The notice was not given by this court nor on application of the United States Attorney, nor by any attorney appointed by this court for that purpose. The cause was presented as part of the original equity case by the attorney who represented the plaintiffs in that case. The order issuing the rule to show cause was not intended to be, and was not, an authorization to such counsel to proceed under Rule 42(b). "This was not a proceeding in which the United States was a party and in which it was seeking to vindicate the public interest." Penfield Co. v. Securities & Exch. Commission, 330 U.S. 585, 67 S.Ct. 918, 921, 91 L.Ed. 1117.

In my opinion, the objectives of Rule 42(b) can only be achieved by faithful adherence to its requirements. The characteristic confusion concerning contempts which existed before Rule 42(b), would be revived if exception upon exception were to be read into the rule. The Supreme Court has, of course, made it clear that the failure to call a proceeding criminal will not in itself constitute a fatal departure from the rule. United States v. United Mine Workers of America, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884. In that case, however, not only was the contempt prosecuted by the United States, but the defendants were fully aware that a criminal contempt was charged. Indeed, the rule to show cause ordered the accused to be tried "by the court with an advisory jury." See Penfield Co. v. Securities & Exch. Commission, supra.

In this case, neither the United States attorney nor any other governmental agent or agency was a party to these proceedings or had any interest therein. The respondents proceeded upon the assumption that the contempt was civil. At the request of counsel for petitioners, several respondents testified and were cross-examined by him without regard to the rules against self-incrimination. See Gompers v. Buck's Stove & Range Co., supra, 221 U.S. 418, at page 444, 31 S.Ct. 492. At one point in the trial, counsel for petitioners indicated that he would amend his petition

to conform to the proof. See Rule 15(b), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. The United Mine Workers case (supra) made it clear that in a single proceeding, where the United States is the complainant, both criminal and civil contempt may be charged. See United States v. Aberbach, 2 Cir., 165 F.2d 713. But the fact that the petition requested criminal and civil relief is not sufficient to attach to a civil proceeding both civil and criminal characteristics. Norstrom v. Wahl, 7 Cir., 41 F.2d 910. If a criminal contempt is committed, no undue hardship is imposed by exacting compliance with Rule 42(b).

■■ The proceeding not having been conducted in accordance with Rule 42(b), the petitioners having availed themselves of prerogatives foreign to criminal trials and the respondents having proceeded as in a civil contempt, this proceeding must be regarded as one of civil and not criminal contempt. It is also my view that if a criminal contempt were charged, it was not proved because those violations of the decree which occurred did not involve the requisite wilfulness of intent. See United States v. Kroger Grocery & Baking Co., 7 Cir., 1947, 163 F.2d 168, 175.

## II.

Are these respondents then guilty of the civil contempts alleged in the petition? The basic issues presented by the evidence and petition involve the propriety of: (1) The action of distributors in granting clearance, that is, denying to outlying theatres an opportunity to exhibit motion pictures until a certain period of time has elapsed after their first exhibition in loop theatres, located in the downtown district of Chicago; (2) double featuring in theatres owned and operated by some of the respondents on the south side of Chicago; (3) permitting the exhibition of a motion picture "Nightmare Alley" in a theatre owned and operated by Balaban & Katz Corporation for longer than two weeks; (4) the action of one distributor, Loew's Incorporated, in failing to release motion pictures for first run in the City of Chicago; (5) the action of Paramount Pictures, Inc., in withdrawing the motion picture "Unconquered" from exhibition in Chicago after it had played two weeks in the loop; (6) the action of Twentieth Century Fox Films Corporation in licensing "Forever Amber" for exhibition at an admission price of $1.25; and (7) the establishment of competitive bidding zones.

The petition also charges numerous other violations of the decree. None of these alleged violations has been proved and it would serve no useful purpose to discuss them in detail. In particular, I find that the evidence did not prove or tend to prove (1) that the petitioners could only obtain motion pictures for exhibition in their Jackson Park Theatre upon the payment of excessive or discriminatory film rentals; (2) that any one zoning system was set up by Twentieth Century-Fox Films Corporation, RKO Radio Pictures, Inc. and Loew's Incorporated; (3) that the respondents had maintained a uniform system of releasing motion pictures in the City of Chicago; (4) or that the respondents had boycotted producers who licensed their motion pictures for exhibition in the Jackson Park Theatre.

### Clearance.

The petition charged respondent distributors with violating the decree by granting clearances after first run exhibitions in the loop. Section VII of the decree enjoined the defendants from delaying the exhibition of any motion picture in the Chicago exchange territory by creating dead or waiting time between the conclusion of the first run of a picture in any theatre owned by any defendant and the next succeeding run of the same picture. Section X of the decree defines dead or waiting time as a period of time "uniformly imposed upon exhibitors during which no theatre can exhibit a motion picture which has concluded its first run in the Chicago exchange territory."

The language of Section VII, as defined in Section X, clearly prohibits any defendant distributor from granting clearance to any defendant exhibitor. The Circuit Court of Appeals so construed the section when it upheld this provision despite the complaint of one of the defendants that "the decree should not enjoin the defend-

ants from a first run in the Loop in excess of two weeks and a subsequent run in excess of one week *without any waiting time.*" Bigelow v. RKO Radio Pictures, 7 Cir., 162 F.2d 520, 523.

Respondents in this proceeding vigorously urged that the decree prohibited only uniform or unreasonable clearance, and contended that if clearances granted by individual distributors upon a picture-by-picture basis, were not arbitrary, and did not follow any uniform plan, such clearances were proper.

■ The existing authorities undoubtedly establish that there is nothing illegal in clearances as such, and that "in the absence of an unconscionably long time or too extensive an area embraced by the clearance, or a conspiracy of distributors to fix clearances, there was nothing of itself illegal in their use." See United States v. Paramount Pictures, et al., D.C., 66 F.Supp. 323, 342. But the litigation which preceded the entry of this court's decree disclosed the prevalence of abuses. Consequently "the provisions of the decree complained of were reasonably adapted to breaking up the conspiracy, a part of which was the method of release * * *." Bigelow v. RKO Radio Pictures, 7 Cir., 162 F.2d 520, 523.

■ I do not mean to say that lawful clearances are perpetually enjoined in Chicago. The decree, however, does presently deny to the defendant distributors and exhibitors privileges which are not denied to their competitors. When it is made clear that the absolute prohibition upon clearances is no longer necessary to preclude the revival of uniform systems of clearance or of arbitrary clearances, the decree may be modified upon appropriate application to the court. Those respondents who granted clearance therefore violated the terms of the decree.

### Double Features.

Section IX of the decree prohibits the respondents from playing "double features for the purpose, with the intent or with the effect of preventing the Jackson Park Theatre, owned by the plaintiffs from obtaining motion pictures which have not been theretofore played by competing theatres owned or operated by the defendants."

■ Petitioners apparently assumed that this section prohibits all respondent exhibitors from double featuring any and all prior run pictures of the South Side of Chicago. This conclusion is not justified either by the language of the decree or the intention of this court. Double featuring in and of itself is not illegal. See Bigelow v. RKO Radio Pictures et al., 7 Cir., 150 F.2d 877, 885. Theatres throughout the country, whether because of competitive conditions or custom, show double features. Only the use of double features with the intent, purpose and effect "of preventing the plaintiffs from obtaining pictures before the defendants have channeled them through the conspiratorial system" was enjoined. See Bigelow v. RKO Radio Pictures, 7 Cir., 162 F.2d 520, 523.

■ The evidence convinces me that the respondents attempted to comply with Section IX of the decree. No motion pictures were double featured by any respondent exhibitors on the South Side of Chicago until petitioners' theatre had been given an opportunity to negotiate for a first run. Only after the Jackson Park Theatre refused to negotiate for, or declined to license, these pictures, did the respondents double feature them. The decree enjoined the playing of two feature pictures when the object or effect of the double featuring was to deny petitioners' theatre "clear product." The evidence indicates that "clear product" was available to the petitioners who, at no time during the entire period in question, were compelled to play a motion picture which had been previously exhibited at a South Side theatre owned by any respondent. So long as distributors afford the Jackson Park Theatre an opportunity to negotiate for first run pictures, respondent exhibitors may play two feature pictures on their programs, after the Jackson Park Theatre has refused or failed to license such pictures.

This court's reservation of jurisdiction to modify and enforce the decree will per-

mit the correction of any abuses, if abuses develop, in the practice of double featuring.

### "Nightmare Alley."

■ The picture "Nightmare Alley" was played at the State and Lake Theatre in Chicago for two weeks, and thereafter duplicate prints thereof were immediately released to outlying theatres, including the Jackson Park. The State and Lake continued to play "Nightmare Alley" for a third week, during which the same motion picture was being exhibited in the neighborhood theatres.

Section VII prohibits the defendants from delaying the exhibition of any motion picture by permitting a run of such picture longer than two weeks in any theatre owned or operated by any defendant.

It is clear from the sequence of events that the exhibition of "Nightmare Alley" was not delayed in the Chicago exchange territory and Section VII was not violated.

### Failure to Release Pictures.

■ For several weeks after the effective date of the decree, the respondent Loew's Incorporated failed to release any motion pictures for first run in the City of Chicago. Witnesses on behalf of Loew's admitted the charge that no pictures were immediately released following the decree, but asserted that no violation of this decree was intended and that the respondents were attempting to formulate a legal and proper system for the release of motion pictures in the City of Chicago.

The evidence established that before the issuance of the rule to show cause, Loew's Incorporated had begun the release of motion pictures in Chicago. Under these circumstances, Loew's failure to release pictures does not appear to have been motivated by any desire to violate the decree but was due to its efforts to establish a proper system of release. Its delay in so doing was not arbitrary and did not violate the decree.

### Road Show.

■ During the summer of 1947, before the effective date of this decree, Paramount Pictures, Inc. released the motion picture "Unconquered," an unusually costly production, throughout the country on what is called a "road show basis," the picture being exhibited in a single theatre in a selected number of cities for a limited time. After the initial showing in the selected theatres, "Unconquered" was removed from exhibition, and witnesses testified that the picture would be generally released some time in April or May of this year.

The road show is an infrequent but well-known occurrence in the industry. See United States v. Paramount Pictures, D.C., 66 F.Supp. 323, 333, footnote 1 for a definition. Nevertheless, the prohibition of clearances and dead or waiting time in the decree did not admit of any exceptions for road shows or any other unusual situations, without specific court authorization. This respondent adopted the paradoxical position of complying with that portion of the decree which prohibits first run theatres from exhibiting a picture for longer than two weeks, while departing from that portion of the decree which prohibits dead or waiting time.

In my opinion, the prohibition against dead or waiting time applied to "Unconquered" with the same clarity as the two week limitation. Paramount Pictures, Inc. consequently violated the decree by its conduct with reference to that motion picture.

### Price Fixing.

■ Twentieth Century-Fox Film Corporation was charged with having licensed the picture "Forever Amber" for exhibition in the Rialto Theatre upon condition that an admission price of $1.25 be charged. The evidence did not convincingly establish that the distributor conditioned the licensing of the film upon the maintenance of that admission price. In any event, however, no contempt is involved since Section V(e) of the decree only prohibits the distributors from fixing minimum admission prices at which petitioners herein must exhibit motion pictures. Cf. United States v. Paramount Pictures, Inc., D.C.N.Y., 1946 70 F.Supp. 53, 73. The Jackson Park Theatre was not affected by the incident and no violation of the decree is involved. The gen-

eral charge in paragraph 12 of the petition that Balaban & Katz and Warner Brothers Theatres maintained admission prices by tacit agreement, was not proved.

### Zoning.

The evidence failed to establish that the defendant distributors have maintained a uniform system of zoning. The evidence did establish that several distributors, including Paramount Pictures, Twentieth Century-Fox, RKO Radio Pictures, and Loew's Incorporated, devised plans whereby different sections of the City of Chicago, including the South Side, were zoned. The petitioners' theatre, the Jackson Park, was afforded an opportunity to bid against other theatres within the same zone in order to obtain. motion pictures. The zones established by Twentieth Century-Fox differed from those of RKO, those of RKO differed from Loew's, Incorporated, and Paramount's differed from the others.

There is nothing in the decree which prohibits individual distributors from creating zones for competitive bidding. This court does not propose to interfere with the right of distributors to release their pictures pursuant to such plans unless it be shown that the zones are being used as a subterfuge to nullify the decree. The expediting court in United States v. Paramount Pictures recognized the propriety of competitive zone bidding when it required that, except with reference to their own theatres, distributors should offer licenses at a minimum price for any run desired by the operators of each theatre within a competitive area. The court stated: "The license desired shall in such case be granted to the highest responsible bidder having a theatre of a size and equipment adequate to show the picture upon the terms offered." 66 F.Supp. 323, 358. In the decree in that case, a competitive area was defined as "the territory occupied by more than one theatre in which it may fairly and reasonably be said that such theatres compete with each other for the exhibition of features on any run." 70 F.Supp. 53, 74.

The decree in this case attempted to ensure petitioners' theatre an equal opportunity with theatres operated by defendant exhibitors to compete for first run exhibitions. The Circuit Court of Appeals has already said that "the plaintiffs have a right to compete for any playing position, but they have no right to be awarded and protected by decree in any certain position." 162 F.2d 520, 524. It may be that petitioners disagree with the zones fixed by respondents and feel they should be larger in some instances and smaller in others. The determination of whether a zone is properly established involves numerous factors which depend on business judgment and which will not be reviewed by this court except under unusual circumstances. If the distributors provide the Jackson Park Theatre an opportunity to bid for the exhibition of motion pictures in the established competitive areas and if these zones are devised reasonably and in good faith, this court will not interfere with their commercial practices. There is nothing in the record before me to indicate that the respondents did not establish their zones in a manner consistent with these views.

### Respondents.

Of the corporate respondents, I find the following to have been in contempt: Balaban & Katz Corporation, Paramount Pictures, Inc., RKO Radio Pictures, Inc., Twentieth Century-Fox Film Corporation.

I further find that no contempt charge was sustained against Warner Bros. Theatres, Inc., Warner Bros. Pictures, Inc., or Loew's, Incorporated. None of these corporations was charged with granting clearance and none of them violated the decree in any other respect. Although no specific charge of granting or accepting clearance was made in the petition for the rule to show cause against RKO or Balaban & Katz, these respondents were charged generally with maintaining an objectionable system of release and the issue was tried with their implied consent. See Rule 15 (b), Rules of Civil Procedure.

The rule to show cause will be discharged as to all individual respondents.

The participation of their Presidents, Spyros P. Skouras and Barney Balaban, in the contempts committed by

Twentieth Century-Fox, Paramount Pictures, and Balaban & Katz, was not established. Modern business practice requires that officers of large corporations delegate duties to, and rely upon, other officers and employees. When there is no evidence of bad faith; where the responsibility for compliance has been reposed upon another official or employee without any attempt to evade the obligation of compliance; and if the president of the corporation was not derelict in performing his direct or supervisory duties, the occupancy of an official position is not enough to demonstrate contumacious participation. See United States v. Standard Sanitary Mfg. Co., C.C., 191 F. 172, 194, affirmed 226 U.S. 20, 33 S.Ct. 9, 57 L.Ed. 107; Worden v. United States, 6 Cir., 204 F. 1; United States v. Taystee Baking Co., D.C., 55 F.Supp. 490.

 The Assistant General Counsel of Paramount Pictures was also cited for contempt. The charges against him were not proved. Indeed, no evidence whatsoever was presented to show his connection with any of the contemptuous acts. There is not even a suggestion in the record that his attitude towards this court or this decree was in any wise improper or incorrect. The evidence also failed to prove that the Branch Manager of the Chicago District for RKO Radio Pictures, the Branch Manager of Twentieth Century-Fox, or any of the other individual respondents, bore any responsibility for granting or accepting clearances, with but three exceptions; to-wit: William G. Gehring, General Sales Manager, and Jack Lorenz Midwest Sales Manager, of Twentieth Century-Fox, and John Balaban, Secretary-Treasurer of Balaban & Katz. In every instance, however these officials were merely following the advice of their attorneys. While their attorneys may have acted imprudently in giving opinions without reference to the views of this court and while counsel may have arrived at erroneous conclusions in so doing, the reliance of these respondents upon counsel for the interpretation of a legal document was reasonable and natural. Although it is no doubt true that in a civil contempt proceeding neither advice of counsel nor good intentions can sterilize conduct otherwise contemptuous (Economist Furnace Co. v. Wrought-Iron Range Co., C.C., 86 F. 1010; Eustace v. Lynch, 9 Cir., 80 F.2d 652; In re Eskay, 3 Cir., 122 F.2d 819, the circumstances attending the conduct of the individual respondents in this case persuade me to find that they were not in contempt. That these individuals acted in good faith and in the belief that they were right in following the advice of counsel, I have no doubt. The dignity of this court and the sanctity of the decree will be sufficiently protected by the findings against the corporate respondents. See Dinsmore v. Louisville, New Albany & Chicago R. R. Co., C.C., 3 F. 593, 608.

### Penalty and Punishment.

At the close of the entire proceedings, counsel for petitioners stated that his clients were not asserting any claim to damages, but suggested the imposition of a million dollar fine, to be paid to the clerk of this court and held by him until the lapse of a year. If during that time respondents complied with the decree, such amount was to be returned to them.

 As I have already indicated, I regard this as a civil proceeding and hence one which does not permit me to take any punitive measures. In a civil contempt, the court may only impose remedial punishment to compensate a litigant who has suffered special injury or damages by reason of the contumacious conduct of the defendant. See Parker v. United States, 1 Cir., 1942, 126 F.2d 370, 380; Id., 153 F.2d 66, 70, 163 A.L.R. 379. Apparently, petitioners have not thus suffered. As partial reparation, however, all respondents who have been found guilty of contempt will be charged with the costs of this proceeding and with the expenses incurred by petitioners in presenting this matter to the court.

Petitioners may file an application for allowance of their attorneys' fees and expenses. The respondents will be given an opportunity to be heard on such application.

Findings and a form of decree should be proposed by the parties in accordance with the views herein expressed.